

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-2006

# Arcadia Petroleum v. Sun Intl Ltd

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1259

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Arcadia Petroleum v. Sun Intl Ltd" (2006). *2006 Decisions.* Paper 569.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/569

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1259
_____

ARCADIA PETROLEUM LIMITED,
Appellant

v.

SUN INTERNATIONAL LIMITED

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. No. 04-cv-00821)
District Judge:  The Honorable John R. Padova
_____

ARGUED JUNE 8, 2006

BEFORE: AMBRO, FUENTES, and
NYGAARD, Circuit Judges.

(Filed:  August 18, 2006)

_____


Ann-Michele G. Higgins, Esq. (ARGUED)
Angela M. Heim, Esq.
Rawle & Henderson
One South Penn Square, The Widener Building
Philadelphia, PA 19107
            Counsel for Appellant

Elizabeth C. Bailey, Esq.
Lawrence D. Jackson, Esq. (ARGUED)
Cozen & O'Connor
1900 Market Street, 4th Floor
Philadelphia, PA 19103

Raymond T. Letulle, Esq.
Cozen & O'Connor
200 Four Falls Corporate Center
P.O. Box 800, Suite 400
West Conshohocken, PA 19428- 0800
<u>Counsel for Appellee</u>

——————

OPINION OF THE COURT
——————

NYGAARD, <u>Circuit</u> <u>Judge</u>.

The issue before us on appeal is, as it was before the District Court, simply a matter of contract interpretation. Appellant, Arcadia Petroleum Ltd., is seeking to recover demurrage[1] resulting from two Charter Party Agreements between Arcadia and Appellee, Sun International Ltd., involving the carriage of crude oil. It is undisputed that, at one time, Sun agreed that it owed Arcadia in excess of $600,000 in demurrage. It is also undisputed that Sun has paid Arcadia nothing. The issue is whether, when Sun and Arcadia resolved the disputed amount of the demurrage claim, they created separately enforceable contracts, subject to Pennsylvania's four-year statute of limitations, or

_____

[1.] Demurrage is the parties' agreed upon amount of damages to be paid for a ship's delay caused by a default of the charterers at either the beginning or end of a ship's journey. John Schofield, *Laytime and Demurrage* § 6.3, at 317 (4th ed. 2000) (quoting *Harris v. Jacobs*, 15 Q.B.D. 247, 251 (1885)).

2

whether the resolution of this dispute is covered by the Charter Party Agreements' dispute resolution clause and its one-year limitation of actions.

The District Court concluded that Arcadia's claims against Sun were barred by the one-year limitation in the original Charter Party Agreements, and entered summary judgment in favor of Sun.  We will affirm.

**I.**

The facts are not disputed.  Arcadia, an oil trader, entered into two separate Charter Party Agreements[2] with Sun, one in 1999 and the other in 2000, concerning the carriage of crude oil.  Arcadia was the owner of the vessel, M/V MADELAINE, and Sun was the charterer.  The Charter Party Agreements were fairly standardized contracts on a form called the "Asbantankvoy" with several specific clauses added and agreed to by Arcadia and Sun.

The first contractual clause germane to the issue is the Demurrage Clause.  It specifies how any damages Arcadia may suffer because of Sun's delay in completing the voyage or off-loading the cargo would be calculated.[3]

---

[2.]A "Charter Party Agreement" is a document entered into when the charterer takes over the use of a ship belonging to the owner. This document sets forth the arrangements and contractual engagements between these parties.  Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 4.1, at 193 (2d ed. 1975).

[3.]The relevant language states:

> Charterer shall pay demurrage per running hour and pro rata for a part
> thereof at the rate specified in Part I for all time that loading and

(continued...)

3

The second is the Dispute Resolution Clause. It specifies that any dispute relating to the Charter Party Agreements would either be litigated in the U.S. District Court for the Eastern District of Pennsylvania or subject to arbitration in New York City. The party that initiated the proceedings could choose the forum in which to bring its cause of action.

The third clause, and the one that resolves the issue, is the Claims Clause, which is contained in each Charter Party Agreement. The Claims Clause sets forth the procedure for submitting demurrage claims. It also includes the contractual time bar under which a party who fails to demand arbitration or file suit to resolve a disputed claim within one year is deemed to have waived the claim or unresolved dispute. Specifically it provides:

> Owners and Charterers further agree that with respect to *any claim* or other unresolved dispute *arising out of this Charter*, unless arbitration or litigation, as per this Charter, is commenced within one year after the completion of discharge or the date when discharge would have been completed, such claim or other dispute is waived and all liability with respect thereto is discharged. (Emphasis added.)

The 1999 Charter Party Agreement called for the carriage of crude oil aboard Arcadia's ship, the M/V MADELAINE from Nigeria, which was to be discharged at Sun's refinery port in Philadelphia. The ship departed Escravos, Nigeria, on January 9,

---

[3.](...continued)
discharging and used laytime as elsewhere hererin provided exceeds the allowed laytime elsewhere herein specified.

The Demurrage Clause also included specific provisions, not relevant here, if the delay resulted from a condition beyond Sun's control, such as fire, storm, explosion, strike, stoppage or restraint of labor.

2000, arrived at port on January 25, 2000, and discharge was completed on February 5, 2000. On February 10, 2000, Arcadia notified Sun of the demurrage incurred and sent the appropriate documentation. The demurrage resulted from Sun's delay of 11 days, 10 hours and 10 minutes calculated at a rate of $27,000 per day.

The 2000 Charter Party Agreement called for the carriage of crude oil again from Nigeria to Sun's refinery in Philadelphia. The M/V MADELAINE departed Escravos, Nigeria, on February 27, 2000, arrived at port on March 17, 2000 and completed discharge on March 29, 2000. On April 5, 2000, Arcadia notified Sun of its demurrage supplemented by the appropriate documentation. The demurrage resulted from Sun's delay of 11 days, 9 hours and 49 minutes calculated at a rate of $27,000 per day.

Sun disputed the amount that Arcadia claimed was due, and negotiations on the amount of demurrage followed. The dispute was resolved. Arcadia agreed to accept $300,943.43 for the 1999 Charter Party Agreement and $299,582.80 for the 2000 Charter Party Agreement, for a total demurrage of $600,525.23.

On October 27, 2000, within two days of the conclusion of negotiations on the 2000 Charter Party Agreement, Sun sent its own demurrage and cargo claims to Arcadia stemming from voyages on the M/V SERENA and the M/V KISHORE. Sun claimed that $625,287.75 in demurrage was due from Arcadia. Sun's position was that inasmuch as demurrage set-offs are customary in the vessel charter industry, and because it was owed approximately the same amount that it owed to Arcadia, any demurrage due to Arcadia was completely set-off. Hence, Sun declared that it would pay Arcadia nothing on the

5

demurrage charge arising from the Charter Party Agreement at issue here. Arcadia objected to the set-off because Sun's demurrage claim arose from separate crude oil purchase agreements between the parties, not from the 1999 and 2000 Charter Party Agreements. Nonetheless, it neither demanded arbitration nor filed suit at that time.

## II.

It was not until February 2004, that Arcadia filed suit in the U.S. District Court for the Eastern District of Pennsylvania. Attempting to salvage its claim from the contractual time-bar, Arcadia contended that the demurrage negotiations between the parties concerning the voyages on the M/V MADELAINE resulted in separate settlement agreements governed by Pennsylvania's general four-year statute of limitations for contract claims. Arcadia averred that Sun breached these settlement agreements.

Sun responded that the negotiations were simply the exchange of accountings of demurrage done in the normal course of business, and, that Arcadia's claims were barred by the one-year limitations period set forth in the original Charter Party Agreements. The parties filed cross motions for summary judgment.

The District Court opined that the parties did not enter into binding settlement agreements because neither party made mutual concessions nor was there any consideration to support the formation of new agreements. *See District Ct. Op.* at 10. The District Court determined that Arcadia's claims stemmed from the two original Charter Party Agreements, and that Arcadia waived its rights to seek demurrage from Sun

6

because it failed to bring suit within the one-year limitation period set forth in the Charter Party Agreements. The District Court then granted summary judgment in favor of Sun.

## III.

It is unquestioned that Sun breached its contracts with Arcadia. Sun admits that it entered the 1999 and 2000 Charter Party Agreements with Arcadia under which demurrage would be paid for any delays. It is undisputed that delays occurred, demurrage incurred, and that the parties negotiated the amounts due. Moreover, Sun admits that it has paid nothing to Arcadia to satisfy Arcadia's demurrage claims.

Nonetheless, Arcadia has waived its right to collect any amount that was due. The language of the Charter Party Agreements is clear and unambiguous. Arcadia's demurrage claims cannot be excised from the Charter Party Agreements and transmuted into separate agreements subject to Pennsylvania's statue of limitations. The contracts breached were not new settlement agreements resulting from the parties' negotiations, but rather the 1999 and 2000 Charter Party Agreements. We conclude that Arcadia's demurrage claims originated under them and any dispute arising therefrom is governed by the Charter Party Agreements' dispute resolution clause.

The negotiations were simply exchanges of demurrage calculations. The record shows clearly that this is usual and customary in the vessel charter industry following the discharge of the cargo.[4] It is also counterintuitive to believe that with hundreds of

---

[4.]For example, in support of its summary judgment motion, Sun submitted the affidavit of
(continued...)

7

thousands of dollars at stake, with demurrage being figured to the minute, the parties would not engage in some substantial quibbling over the amount claimed. Indeed, if all disputes over demurrage created new contracts divorced from the Charter Parties, the Demurrage, Dispute Resolution and Claims Clauses contained the Charter Party agreements would be nullified. The record reflects that the parties simply used a method intuitively expected and common in the trade to agree upon the demurrage. Moreover, Arcadia was put on notice almost immediately after they negotiated the demurrage that Sun had no intention of paying it.

Sun's declaration that it did not intend to pay Arcadia any amount of demurrage was notice to Arcadia of an anticipatory breach of Sun's payment obligations under the Charter Party Agreement. That breach of the Charter Party Agreements, constituted an unresolved dispute or claim which necessitated action by Arcadia under the claims clauses set forth in the 1999 and 2000 Charter Party Agreements. Well within the one-year limitation of actions period, Arcadia knew that Sun was not going to pay what it owed under the 1999 and 2000 Charter Party Agreements. However, instead of

---

[4.](...continued)
Thomas Lamm, Marine Coordinator for Sun from 1995-2001, who stated that it was usual and customary with respect to vessel charters for the parties to engage in an accounting for demurrage following the discharge of cargo. *See* Lamm Aff. at ¶ 6. (A162a.) In response, Arcadia submitted the affidavit of Mark Reed, an Advisor to the Energy Department for Mitsui & Co. UK PLC (a 20% shareholder in Arcadia), who did not dispute that such an accounting was usual and customary. *See* Reed Unswn. Dec. Pursuant to 28 U.S.C. § 1746 at ¶¶ 1-12. (A60a-62a.) Furthermore, in its Complaint, Arcadia stated that the exchanges of parties' demurrage calculations after the discharge of cargo is "usual and customary at the completion of charters." Pl's Compl. at ¶6. (A6a.)

demanding arbitration or filing suit to resolve this dispute within the one-year limitations period set forth in the Charter Party Agreements, Arcadia chose to take no action for nearly four years.

Because those Charter Party Agreements govern this dispute, and because both contained a one-year limitations period for resolving any claim arising under them, any demurrage claims that Arcadia had against Sun have been waived by the passage of time. Arcadia was bound to either demand arbitration or file suit against Sun on the demurrage claims within one year. Because it did neither, the claims are time-barred.[5]

The judgment of the District Court will be affirmed.

AMBRO, <u>Circuit Judge</u>, Dissenting:

Arcadia brought this lawsuit to enforce two agreements reached by written correspondence with Sun in September and October of 2000. The District Court offered two rationales for why Arcadia cannot do so and my colleagues in the majority follow an alternative course to reach the same conclusion. I cannot follow any of the various paths of reasoning taken to this conclusion, as I believe they misconstrue contract law. I respectfully dissent.

After performing the first delivery of oil, Arcadia made a claim under the parties' charter agreement for one amount of demurrage, Sun countered with less, and

---

[5.]Because we hold that no separate settlement agreements were ever formed, we need not discuss the District Court's denial of Arcadia's equitable grounds for relief or Arcadia's evidentiary challenges.

9

Arcadia accepted. After the second delivery, Arcadia made a claim for one amount of demurrage, Sun made an "initial offer" (Sun's own words) for less, Arcadia disputed one adjustment that Sun had made, Sun relented on that point, and Arcadia accepted. On these facts, the District Court concluded that these "settlement" agreements were unenforceable for lack of consideration because (1) the record was "devoid" of evidence of a dispute between the parties and (2) there were no mutual concessions by the parties. The District Court concluded that, because there were no enforceable settlement agreements reached, Arcadia was actually raising claims under the initial charter party agreements that were time-barred.

The District Court's conclusion about the lack of consideration in these agreements runs counter to black-letter contract law. Sun offered a hypothetical to illustrate its position, arguing that this situation is akin to Arcadia agreeing to paint Sun's house for $1 per square foot of wall space. Ironically, this hypothetical illustrates why Sun's position is incorrect. Inevitably, the hypothetical painter and homeowner measure the wall space differently – just as Arcadia and Sun arrived at two different calculations of how much Sun owed for demurrage. When the parties eventually agree on a dollar figure, Sun argues this second agreement is not separately enforceable.

This is incorrect. When parties disagree about an unliquidated obligation and subsequently affix a dollar figure to that obligation, their second agreement is enforceable:

If the terms of a contract are such as to leave the amount payable for goods or services uncertain in amount, by reason of indefiniteness in modes of measurement or otherwise, a mutual agreement by which the uncertainty is removed by fixing a specific amount or by substituting a definite method of measurement is not invalid by reason of pre-existing legal duty. Whether it is unilateral or bilateral in form, there is consideration to support the substituted contract.

2 *Corbin on Contracts* § 7.17, at 442 (rev. ed. 1995). In *Yoder v. T.F. Scholes, Inc.*, 173 A.2d 120 (Pa. 1961), a contractor was to receive "4% of net profit before taxes" and, prior to completion of the job, the parties agreed to the estimate of $12,330.58 for this amount. *Id.* at 121. When profits were less than anticipated, the Pennsylvania Supreme Court found that the second agreement, in which the parties affixed a dollar figure to the method of calculation provided in the initial contract, was separately enforceable because "[c]onsideration for the new contract appears in the liquidation, before completion of the job, of an unliquidated amount by which the contract had to be calculated." *Id.* at 122.

Like in *Yoder*, the parties in our case formed an initial contract in which one of Sun's obligations depended on a calculation to be made in the future.[6] Like in *Yoder*, the parties subsequently agreed to remove uncertainty by affixing a specific amount to an unliquidated obligation. Like in *Yoder*, the parties' second agreement was supported by consideration that "appears in the liquidation . . . of an unliquidated amount by which the contract had to be calculated." *Id.* at 122.

---

[6.] Sun essentially conceded before the District Court that its obligation to pay demurrage in the charter party agreements was unliquidated. *See*, *e.g.*, App. at 107, 131.

The District Court first suggested that there was no consideration because there was no dispute between the parties. The undisputed facts say otherwise. In Pennsylvania, parties need only have a "bona fide," "legitimate," "honest," or "good faith" disagreement before compromise of their position will be considered valid consideration. *See Metz Contracting, Inc. v. Boxer Heights, Inc.*, 395 A.2d 1373, 1376 (Pa. Super. Ct. 1978); *Nowicki Const. Co., Inc. v. Panar Corp., N.V.*, 492 A.2d 36, 40 (Pa. Super. Ct. 1985); *Ciavarro v. Cost Control Mktg. & Mgmt., Inc.*, 603 A.2d 214, 278-79 (Pa. Super. Ct. 1992). The two parties here took two different positions about how much demurrage Sun was obligated to pay under the charter agreements. Sun does not allege that Arcadia's initial claim for demurrage was illegitimate or made in bad faith. Sun argues that Arcadia is obligated to support its initial claim for demurrage to show that a dispute existed. Essentially, Sun argues that its position on the interpretation of the charter agreements was sound and, thus, there was no real dispute and no compromise. But once a Pennsylvania court finds two parties in honest disagreement, "[t]he sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party." *Metz Contracting*, 395 A.2d at 1375. We need not revisit the merits of the parties' positions in the underlying dispute to determine if Arcadia's compromise was valid consideration.

12

The District Court also found no consideration because there were no mutual concessions between the parties.[7] This rings of a "pre-existing duty" doctrine argument: Sun offered to pay what it was already obligated to pay, so no new consideration supported Arcadia's acceptance. The Pennsylvania Supreme Court has described why this argument fails within the context of accord and satisfaction:

> Not infrequently, though a claim is . . . the subject of a bona fide and reasonable dispute, it is conceded that at least a certain amount is due. While it would appear that in paying this conceded part of the claim, the debtor was merely doing what he was previously bound to do, the law looks upon an unliquidated or disputed claim as a whole and does not attempt to set a value upon it. . . . Accordingly, such a claim is dealt with . . . as something the adequacy of which as consideration will not be measured. . . . [T]he payment of the amount admittedly due will support a promise to discharge the whole claim.

*Cohen v. Sabin*, 307 A.2d 845, 849 (Pa. 1973) (quoting *Williston on Contracts*). Looking at the dispute as a whole, Sun had an unliquidated obligation in the initial charter agreements. By making claims for certain amounts of demurrage, Arcadia conceded that no more than those amounts were due. By countering with offers for less, Sun conceded that "at least a certain amount is due." *See Cohen*, 307 A.2d at 849. Because Sun owed an *unspecified* amount of demurrage, an offer to pay a *certain* amount of demurrage was new consideration. When Arcadia accepted, both parties were bound. Sun could not

---

[7.] By describing the lack of "mutual concessions," the District Court did not suggest, and Sun does not argue, that there was no mutual intent to be bound. *See* App. at 145. Rather, the District Court's conclusion regarding mutual concessions related to consideration. *Id.*

13

refuse to make payments of $300,934.43 and $299,582.80 just as Arcadia could not successfully recover $400,000 and $450,000 in demurrage.

My colleagues in the majority do not discuss the District Court's opinions about consideration. Rather, they understand the District Court to have merely "opined" about the validity of these subsequent settlements and to have reached its conclusion based on Arcadia's claims being time-barred. The District Court did conclude that Arcadia's claim was barred by the one-year contractual limitations period, but only after finding the subsequently reached agreements were unenforceable. My colleagues seem to accept that the subsequent agreements may be valid and enforceable, though nonetheless they find them time-barred.

I see no support for the notion that Arcadia is asserting a breach of the charter agreements. Arcadia's Complaint asserted two counts of breach of contract – one for each "settlement agreement." App. at 5-8. Arcadia does not claim that Sun breached the charter agreements. Arcadia claims that Sun owes it money because it failed to pay sums it negotiated in late 2000, not because it promised to pay an unquantified amount of demurrage in the charter agreements reached in late 1999 and early 2000. Arcadia's right to recover should stand or fall on the claims *it actually made*, not the claims that Sun has attributed to it. By characterizing Arcadia's claims as breaches of the initial contracts, both the District Court and my colleagues have reinvented Arcadia's claims as ones that are easier to reject.

14

On appeal, Sun repeatedly characterizes the back and forth between these parties as merely an "accounting." My colleagues accept this characterization of the parties' conduct. Neither Sun nor my colleagues clarify why this characterization is relevant to contract law. Arguably, this is an alternative rationale for affirming the District Court without accepting the conclusion than these subsequent agreements lacked consideration. I understand this argument to be that: (1) the parties were engaged in "accounting"– a process to calculate an amount owed by one of the parties, (2) the parties anticipated that this "accounting" would occur (as it is typical in shipping contracts), and, therefore, (3) Arcadia's current claim was anticipated by and encompassed within the one-year time limit in the charter agreement. By this interpretation, enforceable, valid settlement agreements regarding demurrage between these two parties were only enforceable within one year from discharge of cargo.

I disagree because the third point does not logically follow from the first two. It is undisputed that the parties anticipated, planned for, and engaged in a process to determine how much demurrage was owed by Sun to Arcadia, a common practice in this industry. Indeed, Arcadia's complaint described calculating demurrage after completion of the charters as "usual and customary." App. at 6.[8] The parties agreed to negotiate with

8. The District Court attributed enormous significance to a statement by Sun's representative that "[i]t is usual and customary with respect to vessel Charters for the parties to engage in an accounting for demurrage after discharge of the cargo." App. at 147, 153. My colleagues also find this point significant.
    I fail to see the same significance. In Pennsylvania, "custom in the industry or
(continued...)

15

each other for a year to see if they could resolve demurrage disputes. Once the parties resolved how much demurrage was owed, however, Arcadia does dispute Sun's contention that the charter agreements barred suits to enforce those agreements.

I believe that the most natural reading of the language used in the charter agreements supports Arcadia's position. The language of the provision limits the time to litigate or arbitrate certain kinds of disputes about demurrage – disputes that are (1) "unresolved" and (2) "arising out of" the initial charter agreement. In each charter agreement, Arcadia and Sun "agree that . . . any [demurrage] claim or other unresolved dispute arising out of this Charter" would be waived "unless arbitration or litigation, as per this Charter, is commenced within one year after completion of discharge." App. 180, 199. Litigation and arbitration are described in a provision in which the parties agree that

---

[8.](...continued)
usage in the trade is always relevant and admissible in construing commercial contracts" because certain words may have "a special meaning" so that "members of that industry are presumed to use the words in that special way." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001). Trade custom is also "pertinent in determining whether Plaintiff accepted Defendant's offer or whether Plaintiff made a counter-offer." *Lobar, Inc. v. Lycoming Masonry, Inc.*, 876 A.2d 997, 1001 (Pa. Super. Ct. 2005).

But Sun does not identify words in the charter agreements that are used in a special way or some manner of contract formation unique to the shipping industry. The undisputed – and undisputable – contention that it is "usual and customary" to account for demurrage after discharge does not support either party's position. It may be "usual and customary" to account for demurrage after discharge of the cargo and "usual and customary" for those subsequently agreed calculations to be considered separately enforceable. I fail to see why general contract law should not apply rather than a specialized rule for the shipping industry based only on the fact that shipping parties typically account for demurrage after discharge of cargo.

16

"[a]ny and all differences and disputes that cannot be resolved between the parties shall be subject to litigation . . . or in arbitration" in certain venues.  App. 174, 193.

These provisions indicate that the one-year limit applies only to *un*resolved claims to recover demurrage made for breach of the charter agreements.  The textual basis for this conclusion rests on "or *other* unresolved dispute arising out of this Charter" following the reference to demurrage claims.  This phrase connotes that "any claim" for demurrage is a member of the broader set of disputes that are "unresolved" and that "aris[e] out of this Charter."[9]

Contrary to the majority's opinion, this interpretation does not nullify the one-year time limit.  If the amount of demurrage owed under a charter agreement "cannot be resolved between the parties," then, within one year from discharge, the parties must litigate or arbitrate in the proper venue or waive the claim.  A lawsuit in those circumstances would be a claim for demurrage that is an "unresolved dispute arising out of this Charter" and subject to the contractual time-limit.  However, if the parties resolve how much demurrage is owed within that year by reaching a settlement, they can sue to enforce that settlement without regard to the contractual time limit.  Such a lawsuit would not raise an "unresolved" demurrage claim, nor (as explained below) would that lawsuit assert a claim "arising out of this Charter."

---

[9.] For example, the phrase "any tomato, or other fruit," indicates that tomatoes are considered fruits.

17

Arcadia's claims are to enforce payment of negotiated settlement sums. Its Complaint asserts two claims seeking payments from Sun of amounts Sun promised in the context of settling demurrage claims. Neither of these claims was an "unresolved dispute arising out of" the charter agreements. Indeed, the parties had resolved how much demurrage Sun owed to Arcadia with regard to these shipments. Sun does not contend otherwise. It did not refuse to pay because it questioned whether it owed those amounts, but rather because it claimed the debt was offset by debts incurred in separate transactions.

Arcadia's claims also do not arise from the charter agreement. As noted, Arcadia's complaint asserted two counts of breach of contract – one for each settlement. App. at 5-9. It did not claim a breach of the charter agreements. It is an unremarkable proposition that a lawsuit to enforce a settlement agreement "arises" from a different source of law than the underlying claim. *Cf. Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) ("The suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit. No federal statute makes that connection . . . the basis for federal-court jurisdiction over the contract dispute."); *Ridgeway v. U.S. Life Credit Life Ins. Co.*, 793 A.2d 972, 977-78 (Pa. Super. Ct. 2002) (holding that a statutory provision limited to claims "arising under an insurance policy" did not include claims for post-settlement or post-judgment conduct by insurer).

These contracting parties chose to include the modifiers "unresolved" and "arising out of this Charter" to describe the claims to which the one-year limitations

18

period applied.  The most natural reading is that these modifiers differentiate lawsuits in which parties seek to determine how much demurrage is owed from lawsuits seeking payment of agreed-upon amounts.

In addition, the contrary view leads to odd results.  If the charter agreements bar enforcement of all settlement agreements after one year, Sun could negotiate until the 11th hour, settle, and simply not send a check.  Arcadia could not, under this reading, litigate or arbitrate prior to the 11th hour settlement since the parties agreed to pursue such avenues only for disputes that "cannot be resolved between the parties."  Arcadia, thus, could not enforce the 11th-hour settlement because the claim would be waived by the time the breach occurs.  For another example of an odd result, if the parties settled this case during this appeal, that settlement would be unenforceable by this interpretation.  As the majority characterizes the current claim, a lawsuit to enforce a 2006 settlement could also be characterized as an attempt to "transmute" a claim for demurrage into a claim for settlement enforcement.

My colleagues in the majority point out that Arcadia was given notice two days after it reached the second agreement that Sun was not going to make either payment as promised.  The question is whether this act started a four-year clock or a four-month clock for Arcadia to enforce this agreement.  On slightly different facts, it could have been a two-month, one-month, or even one-day clock, and this time-limit provision, as interpreted by the majority, could not remain reasonable and enforceable in all of these circumstances.  *See* 42 Pa. Const. Stat. § 5501.

19

My colleagues also question why Arcadia waited four years to bring this lawsuit. Allowing four years for contracting parties to work out their differences before bringing contract disputes to court is a decision made in Harrisburg, not by this Court.

Finally, I find it difficult to understand how we can affirm the District Court on this alternative ground. Sun has not explained how the text of the one-year contractual time limit should be interpreted to encompass both claims made under the charter agreements as well as lawsuits to enforce settlements of those claims.[10] In interpreting contractual limitations provisions, "the intent of the parties to a written contract is ascertained from that writing." *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental*, 892 A.2d 830, 837 (Pa. Super. Ct. 2006). Even if I agreed with Sun's interpretation, I would be hesitant to conclude that the language of the charter agreements is so clear and unambiguous that Sun is entitled to judgment as a matter of law without a more precise explanation as to how the text of each charter agreement supports Sun's position.

I disagree with the District Court because I believe that a Pennsylvania court would find the agreements reached by these two parties in September and October

---

[10.] Both parties stated their conclusions about the scope of the contractual limitations period with little discussion of the textual support for those conclusions. Sun contends that the limit encompassed all suits to recover *unpaid* demurrage. *See* Br. Appellee at 27 ("Arcadia had until [certain dates] . . . to demand arbitration or institute litigation in connection with its demurrage claims to the extent they remained unpaid."). Sun does not explain why they chose the modifiers "resolved" and "unresolved" to describe demurrage claims in the charter agreement to mean "paid" or "unpaid."

20

2000 to be valid and enforceable. I disagree with my colleagues, as I believe that the text of the one-year contractual limitations period applies only to limit the amount of time the parties must attempt to resolve the amount of demurrage owed, not to limit the time to sue to enforce agreed-upon resolutions of these issues. I would remand to the District Court for further proceedings, and thus respectfully dissent.